No. 21-15802

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

STEVEN W. CROWE,
*Plaintiff-Appellant*,

v.

CHRISTINE WORMUTH, Secretary of the Army, sued in her official
capacity,
*Defendant-Appellee*.

On Appeal from the United States District Court for the District
of Hawaii in No. 1:18-cv-00288-ACK-RT

The Honorable Alan C. Kay

**PLAINTIFF-APPELLANT'S OPENING BRIEF**

CABALLERO LAW LLLC

MATEO CABALLERO
Hawaii Bar No. 10081
mateo@caballero.law
P.O. Box 235052
Honolulu, Hawaii 96823
Telephone:  (808) 600-4749

SMITH HIMMELMANN AAL ALC

ELBRIDGE W. SMITH
Hawaii Bar No. 2079
shlaw@hawaii.rr.com
ELBRIDGE Z. SMITH
Hawaii Bar No. 10120
shlaw@hawaii.rr.com
745 Fort St Ste 311
Honolulu, HI 96813-3803
Telephone:  (808) 523-5050
Facsimile:   (808) 538-1382

December 7, 2021

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ......................................................... 4

ISSUES PRESENTED ......................................................................... 4

STATEMENT OF THE CASE ................................................................ 6

    I.    Factual Background ................................................................. 6

    II.    Relevant Procedural History ............................................. 11

summary of the argument .................................................................. 17

standard of review............................................................................. 19

ARGUMENT...................................................................................... 20

    I.    Plaintiff Exhausted Administrative Remedies for His Pre-Termination Discrimination and Retaliation Claims under Title VII. .............................................................................. 20

        A.    Plaintiff properly severed his pre-termination claims for discrimination and retaliation from his wrongful discriminatory termination claim initially pending before the EEOC. ................................................................. 23

        B.    The MSPB did not have jurisdiction to decide Plaintiff's pre-termination discrimination and retaliation claims. ........... 25

        C.    The failure to decide Plaintiff's pre-termination claims within 180 days from the filing of the EEO Complaint allowed Plaintiff to pursue his Title VII claims in district court. ........................................................................... 28

    II.    Issues of Material Fact Prevent Granting Summary Judgment on Plaintiff's Discrimination Claims. ................................. 29

        A.    Slurs used repeatedly by investigator into Plaintiff's alleged misconduct are sufficient to create an issue of material fact as to whether Plaintiff's sexual orientation

i

was a motivating factor for the investigation and other adverse actions taken against Plaintiff. .................................... 30

B.    There is a dispute of material fact as to whether Plaintiff's supervisors were motivated by animus against people who do not conform to heterosexual norms such as Plaintiff. ............................................................ 35

C.    The timing of the investigation and other adverse actions against Plaintiff create an issue of material fact as to whether such actions were taken in retaliation for Plaintiff complaining about discrimination and harassment on the basis of his sexual orientation. ................... 37

III.    The District Court Erred in Holding that Plaintiff Abandoned His Retaliatory Termination Claim During the MSPB Process......... 40

IV.    The Recanted and Re-Recanted Testimony of a Disgruntled Ex-Girlfriend Was Insufficient to Sustain MSPB's Decision Upholding Plaintiff's Removal from his Position with the Army. .............................................................................. 43

CONCLUSION................................................................... 46

# TABLE OF AUTHORITIES

**Cases**

*Al-Saffy v. Vilsack,*
    827 F.3d 85 (D.C. Cir. 2016) ............................................................... 29

*Bostock v. Clayton Cty., Ga.,*
    -- U.S. --, 140 S. Ct. 1731 (2020) ...................................... 1, 13, 31, 37

*Burlington N. and Santa Fe Ry. Co. v. White,*
    548 U.S. 53 (2006) .............................................................................. 38

*Costa v. Desert Palace, Inc.,*
    299 F.3d 838 (9th Cir.2002) .............................................................. 31

*Dahlia v. Rodriguez,*
    735 F.3d 1060 (9th Cir.2013) ............................................................ 38

*Dominguez-Curry v. Nev. Transp. Dep't,*
    424 F.3d 1027 (9th Cir. 2005) ...................................... 18, 29, 33, 35

*Figueroa v. Nielsen,*
    423 F. Supp. 3d 21 (S.D.N.Y. 2019) ................................................. 45

*Hicks v. Small,*
    69 F.3d 967 (9th Cir. 1995) ............................................................... 19

*Howard v. City of Coos Bay,*
    871 F.3d 1032 (9th Cir. 2017) ............................................ 18, 30, 39

*Jasch v. Potter,*
    302 F.3d 1092 (9th Cir. 2002) ........................................................... 19

*Konigsberg v. State Bar of Cal.,*
    353 U.S. 252 (1957) ........................................................................... 27

*Lam v. Univ. of Haw.,*
    40 F.3d 1551 (9th Cir.1994) .............................................................. 33

*Matsushita Elec. Indus. Co. v. Zenith Radio,*
    475 U.S. 574 (1986) ........................................................................... 20

*McGinest v. GTE Serv. Corp.*,
  360 F.3d 1103 (9th Cir.2004) ............................................................... 32

*Mustafa v. Clark Cty. Sch. Dist.*,
  157 F.3d 1169 (9th Cir.1998) ............................................................... 32

*O'Day v. McDonnell Douglas Helicopter Co.*,
  79 F.3d 756 (9th Cir. 1996) ................................................................. 31

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
  212 F.3d 493 (9th Cir. 2000) ............................................................... 38

*Porter v. Cal. Dep't of Corr.*,
  419 F.3d 885 (9th Cir. 2005) ............................................................... 37

*Sloan v. West*,
  140 F.3d 1255 (9th Cir. 1998) .............................................. 17, 22, 26

*Ulrich v. City and Cty. of San Francisco*,
  308 F.3d 968 (9th Cir.2002) ............................................................... 38

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) ............................................................................ 39

*Washington v. Garrett*,
  10 F.3d 1421 (9th Cir. 1993) ......................................................... 20, 43

*Yartzoff v. Thomas*,
  809 F.2d 1371 (9th Cir. 1987) ............................................................. 39

*Zetwick v. Cty. of Yolo*,
  850 F.3d 436 (9th Cir. 2017) ................................................. 19, 20, 35

**Statutes**

5 U.S.C. § 1101 ...................................................................................... 4

5 U.S.C. § 7512 .................................................................. 17, 22, 24, 26

5 U.S.C. § 7701 ............................................................................... 18, 22

5 U.S.C. § 7702 .......................................................................... 4, 21, 22

5 U.S.C. § 7703 ...................................................................................... 5

28 U.S.C. § 1291 ........................................................................................ 5

28 U.S.C. § 1331 ........................................................................................ 4

28 U.S.C. § 1343 ........................................................................................ 4

42 U.S.C. § 2000e–16 ........................................................ 18, 23, 29, 31

42 U.S.C. § 2000e-2 ............................................................................... 31

42 U.S.C. § 2000e-3 ............................................................................... 37

42 U.S.C. § 2000e-5 .................................................................. 4, 29, 32

**Other Authorities**

5 C.F.R. § 1201.151 ................................................................................ 26

5 C.F.R. § 1201.3 ........................................................... 22, 23, 24, 26

29 C.F.R. § 1614.101 ............................................................................. 38

29 C.F.R. § 1614.302 ....................................................... 22, 24, 25, 26

29 C.F.R. § 1614.407 ............................................................. 18, 23, 29

Fed. R. App. P. 3(a)(1) .......................................................................... 17

Fed. R. App. P. 4(a)(1)(B) ..................................................................... 17

Fed. R. Civ. P. 25(d) ................................................................................ 2

Fed. R. Civ. P. 56 .................................................................................... 20

## INTRODUCTION

Just last year, the U.S. Supreme Court confirmed that the Title VII protections against discrimination on the basis of sex extend to people discriminated against because of their sexual orientation. *See Bostock v. Clayton Cty., Ga*., -- U.S. --, 140 S. Ct. 1731 (2020). This case concerns the investigation and eventual termination of Steven W. Crowe ("***Plaintiff***"), a bisexual police officer, following his filing of equal opportunity complaints against the U.S. Army and a senior co-worker, Kevin Oda ("***Oda***"), who had called Plaintiff a "fag" and "faggot" on several occasions at work in the presence of other employees.

Less than two months after Plaintiff complained about Oda using these slurs, their superiors at the U.S. Army's Tripler Army Medical Center Provost Marshal ("***TAMC***") Office appointed Oda, who had no formal investigative training, to investigate Plaintiff for allegedly not acting professionally towards a staff member at the medical center. Instead of focusing on the allegations of unprofessional conduct at hand, Oda proceeded to investigate rumors and gossip about Plaintiff having sexual relations while on duty with an ex-girlfriend, also a staff at the medical center, while Oda arbitrarily ignored witnesses and exculpatory evidence.

The investigation into Plaintiff's personal life resulted in the ex-girlfriend— who had promised to make Plaintiff's life "a living hell" at work after their breakup—now claiming to have had sex with Plaintiff while they both were on

1

duty, a statement she later recanted. After being threatened with termination by the U.S. Army for making a false statement under oath, the ex-girlfriend recanted her recantation. Based primarily on the re-recanted statement, Plaintiff, who had an unblemished civil service record, was terminated from his position as police officer based on a single charge of conduct unbecoming of a police officer.

While Plaintiff had an EEO complaint pending with the U.S. Equal Employment Opportunity Commission ("***EEOC***") for various adverse actions taken prior to his termination, Plaintiff appealed his termination to the Merit Systems Protection Board ("***MSPB***") denying the charge and asserting sexual orientation discrimination and retaliation as an affirmative defense. The MSPB Administrative Judge affirmed the agency's termination decision and Plaintiff filed the present case in district court alleging both violations of his rights under Title VII and the Civil Service Reform Act ("***CSRA***").

After some discovery, Defendant Secretary of the Army[1] moved to dismiss, or in the alternative, for summary judgment. The district court dismissed most of Plaintiff's Title VII claims, erroneously holding it did not have jurisdiction to review claims brought before the EEOC, because Plaintiff had not also raised those

---

[1] Pursuant to Fed. R. Civ. P. 25(d), since Defendant is being sued in her official capacity, the caption page to this brief reflects the Honorable Christine Wormuth as the current Secretary of the Army.

claims with the MSPB. Plaintiff, however, had properly preserved such claims and was entitled by statute to pursue them in court after the agency had not timely acted on them.

Concerning Plaintiff's remaining discriminatory termination claim, although the district court found that Oda's comments showed animus based on sexual orientation, the court explained that Plaintiff's supervisors, not Oda, determined that Plaintiff should be removed from his position, and held that Plaintiff had failed to show any animus on their part. In so holding, the district court downplayed Oda's direct influence as investigator in various unfavorable employment actions taken against Plaintiff and improperly resolved issues of material fact as to whether sexual orientation and retaliation were motivating factors in the termination.

Finally, the district court affirmed the MSPB decision even though it was primarily based on the recanted and later re-recanted testimony of Plaintiff's disgruntled ex-girlfriend. In doing so, the court simply ignored evidence of the ex-girlfriend's bias and motive as she had to take back her recantation under penalty of being terminated herself.

If allowed to stand, the district court's decision would gut the ability of civil service employees to protect their rights under both Title VII and the CSRA, create an unduly high bar to show discrimination and retaliation even in the face of the repeated use of slurs by people with clear influence over the adverse actions taken,

and undermine the judicial role in ensuring agency's disciplinary actions are supported by substantial evidence. This Court should reverse and remand with instructions to proceed to trial on all counts.

## JURISDICTIONAL STATEMENT

Because this case arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("***Title VII***") and its implementing regulations, and under the Civil Service Reform Act of 1978, as amended, 5 U.S.C. § 1101, *et seq.*, and its implementing regulations, the U.S. Equal Employment Opportunity Commission had subject matter jurisdiction under 42 U.S.C. § 2000e-5(b), the Merit Systems Protection Board's had subject matter jurisdiction under 5 U.S.C. § 7702(a)(1), and the district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 2000e-5(f)(3) and 5 U.S.C. § 7703.

The district court granted Defendant's motion to dismiss, or in the alternative, for summary judgment on March 2, 2021, entering a final judgment that same day. 1-ER-2–64. Plaintiff timely filed a notice of appeal with the district court on April 30, 2021. 9-ER-1829–1833. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Did the district court have jurisdiction to decide Plaintiff's claims for discrimination and retaliation that arose prior to termination from federal

employment, where the EEOC partially dismissed the portion of his Equal Employment Opportunity Complaint ("***EEO Complaint***") alleging wrongful discriminatory termination but retained jurisdiction on, but did not timely decide, such pre-termination claims?

2.     Is evidence that Plaintiff, a bisexual man, was called a "fag" and "faggot" on multiple occasions by a senior co-worker tasked with investigating Plaintiff's alleged work-related misconduct sufficient to create an issue of material fact as to whether Plaintiff's sexual orientation was a motivating factor for various adverse employment actions taken during and as result of such investigation?

3.     Did the district court err in holding that Plaintiff abandoned his retaliatory termination claim during MSPB proceedings, where Plaintiff argued that he was investigated and terminated after complaining of sexual orientation discrimination and retaliation, and the MSPB explicitly addressed such claim in its initial decision?

4.     Was the MSPB's decision upholding Plaintiff's removal from his position with the Army supported by substantial evidence, where the most serious allegations against Plaintiff were primarily based on the testimony of a disgruntled

ex-girlfriend who recanted and later re-recanted her original testimony about having intercourse with Plaintiff while on duty?[2]

## STATEMENT OF THE CASE

### I.    Factual Background

Prior to his termination, Plaintiff was employed with the United States Army since February 2009, first as a Psychiatric Nursing Assistant at TAMC and since January 3, 2010, as a Police Officer at the TAMC Provost Marshal Office ("**PMO**"). 5-ER-1074. Until then, Plaintiff, a disabled veteran with multiple tours of service in the Middle East, had an unblemished civil service career with the U.S. Army. 2-ER-383, 385.

In January 2016, Plaintiff heard his senior co-worker, Officer Kevin Oda ("**Oda**"), call another man a "faggot." 4-ER-825–826. Plaintiff responded by telling Oda to watch what he said explaining "I'm a bisexual and then here you are saying this shit in front of me and it's inappropriate." *Id*.

Less than two months later after coming out to his co-worker, on February 22, 2016, Oda introduced Plaintiff to a new PMO officer as a "fag." 4-ER-826– 827. Specifically, Oda stated "Randy meet fag." *Id*. This was not the first time that

---

[2] Because Plaintiff challenges the sufficiency of the evidence before the MSPB, he includes the entire hearing transcript and exhibits before the Board in the excerpts of record volumes 4 through 8. *See* Advisory Committee Note to Circuit Court Rule 30-1.4.

Oda had referred to Plaintiff as a fag, as Oda admitted saying "don't be a fag" during training and other occasions. 3-ER-460–461. Indeed, Oda had also referred to Plaintiff as a "fag" or "faggot" behind his back as well. 4-ER-790–791. The same day of the offensive introduction, Plaintiff sent an email to Provost Marshal Kevin Guerrero, Deputy Provost Marshal James Ingebredsten, and Plaintiff's first-line supervisor, Supervisory Police Officer Michael Ballesteros, to inform them of the incident. 2-ER-170.

That same day, Guerrero responded via email to Plaintiff, Ingebredsten, and Ballesteros, instructing Ballesteros to look into the incident as soon as possible, take corrective action, and report back to Ingebredsten and Guerrero when completed. *Id*. A mere two days later, on February 24, 2016, Ballesteros issued a formal reprimand to Oda for the inappropriate remarks. 2-ER-171. The reprimand indicated that Oda had used similar language in the past. *Id*. About a month after the incident, Oda was promoted to lieutenant. 4-ER-712–713.

Less than two months later, on April 9, 2016, James Sewell, a Medical Support Assistant in TAMC's Emergency Department, sent an email notifying his first-line supervisor, John Novosel, of an April 8, 2016, encounter between Sewell and Plaintiff in the charge nurse area of the Emergency Department, known as the "Red Pit." 2-ER-185. Concerning the encounter, the email stated:

> I AM WRITING THIS EMAIL BECAUSE IN [sic]
> NOW FEEL UNSAFE IN THE ED WHILE CERTEN

[sic] TPD[3] OFFICER IS ON SHIFT AND THAT IS OFFICER CROW. THE REASON IS BECAUSE HE APPROACHED ME YERTERDAY [sic] 8 ARP [sic] 2016 WHILE I WAS WORKING IN THE RED PIT AND THIS IS WHAT HE SAID AND I QUOTE "HEY JAMES WHATS [sic] UP WITH THIS BITCH? YOUR GIRL ANELA. . SHE IS PUTTING ME IN SOME MIX SAYING THAT I WAS JEALOUS OF YOU AND HER. AND I TOLD THAT BITCH THAT I HAVE SOMEONE AND I DON'T WANNA TALK TO HER BUT SHE KEEPS FUCKING WITH ME AND I HAD HER ON MY TEAM BEFORE BUT SHE WON'T LEAVE ME ALONE." I TOLD HIM THERE WAS NOTHING GOING ON BETWEEN US . . . . MY WIFE IS A VA AOD ALSO AND WHEN SHE HEARD THE THINGS THAT WERE BEING SAID SHE GOT UPSET . . . . SO WITH ALL OF THIS BEING SAID I AM NO [sic] SCARED OF CROWE HIMSELF BUT THE FACT THAT HE HAS A GUN AND BEING UNPROFESSIONAL. I WILL NOT BE ABLE TO CONTROL MY ACTIONS AROUND HIM WHEN HE IS SPREADING LIES ABOUT ME IN AND OUTSIDE THE DEPARTMENT. I DON'T WANT ANYTHING TO HAPPEN BUT I WILL DEFEND MYSELF IF I HAVE TO . . . . I WOULD HATE TO HURT HIM OR WORSE HIM HURT ME.

*Id*. (all capital letters in original).

After Sewell's complaint was sent to the PMO, Ballesteros assigned Oda to investigate the allegations. 4-ER-656. At the time, Oda did not have any formal investigative training, 3-ER-511, and was told by Ballesteros to not interview Plaintiff, 3-ER-512. Oda initiated the investigation by interviewing and taking a

---

[3] "TPD" seemingly refers to Tripler Police Department.

sworn statement from Sewell on April 14, 2016. 2-ER-220–222. On April 15, 2016, Oda also interviewed Kianna Ah Lee Sam, Sewell's "wife"[4] and a medical administration specialist ("**AOD**"[5]) for the Department of Veteran Affairs ("**VA**"), and Vashi Kaahanui Tabangcura, another VA AOD. 2-ER-223–229. Neither one of them claimed to be a witness to the alleged incident between Plaintiff and Sewell. *Id*. Lee Sam and Tabangcura talked about their interactions and observations during the times that Plaintiff would come to the VA wing of the TAMC campus, including socializing at length with VA staff and other interoffice gossip. *Id*.

Finally, nearly two weeks later, on April 29, 2016, Oda interviewed Anela Garcia, who provided a sworn statement stating that she had been in a relationship with Plaintiff, which he had broken off, and alleging that she and Plaintiff had sex at TAMC during working hours between 2014 and 2015. 2-ER-230–233. Garcia stated that Plaintiff "had introduced [her] to the location [on the tenth floor]. . . where the other TPD officers go to have sexual relations" and that they would go to that room "three or four times per week" and "Officer Brower and Officer Peay knew about [them] going up and would cover for [Plaintiff]." 2-ER-231. Garcia

---

[4] Lee Sam and Oda were not in fact married, but they were longtime partners and had several children together. 3-ER-422–423.

[5] Medical administration specialists are commonly referred to as "AODs," which stands for administrative officer of the day.

would later recant this sworn statement on November 28, 2016. 2-ER-173. And after being threatened with termination for making a false statement under oath, she would also recant her recantation on May 12, 2017. 7-ER-1413–1415.

After interviewing Garcia, Oda did not gather any corroborating evidence, did not collect or review camera footage, 3-ER-511, 429-430; 4-ER-681–683; and refused to interview Tristen Aczon, another VA AOD, who offered to provide exculpatory testimony concerning Lee Sam's intention to get Plaintiff fired. 3-ER-482–483; 5-ER-1018.

On May 12, 2016, Ballesteros placed Plaintiff on a temporary detail for 30 days to perform administrative duties "WITHOUT Police Powers, meaning no firearm, TASER, and law enforcement gear." 2-ER-264. Plaintiff was also ordered to immediately "surrender [his] uniform badge and police credential with flat badge." *Id*. On June 10, 2016, Plaintiff's placement on administrative duty under these conditions was extended indefinitely. 2-ER-178. On June 24 and July 25, 2016, Ballesteros met with Plaintiff and his union representatives to discuss the alleged findings of Oda's investigation. 2-ER-179–180. During those meetings, Plaintiff's union representative requested specifics about the alleged incidents, such as dates and times, but those were not provided. *Id*. Plaintiff also denied the allegations against him. *Id*.

On November 4, 2016, Ballesteros issued Plaintiff a Notice of Proposed

Removal ("*NOPR*") containing a single charge, "conduct unbecoming of a Police

Officer," based on five specifications, including having sex at TAMC while on

duty, engaging in extended periods of social interaction and gossip, inappropriate

unprofessional behavior towards other employees while on duty, and

misrepresentation when using sick leave. 2-ER-174–177.

On December 22, 2016, Plaintiff submitted a written reply to the NORP. 5-

ER-963–1028. On February 14, 2017, Plaintiff was issued a Notice of Decision –

Removal effective March 4, 2017. 5-ER-877–881.

## II.    Relevant Procedural History

On August 15, 2016, after the investigation but before the NOPR, Plaintiff

timely filed a formal EEO Complaint alleging that he had been discriminated

against on the basis of his "sex (sexual orientation); race (Caucasian); and reprisal

(engaging in protected activity)" based on the investigation, placement on

administrative duty, and denial of overtime that followed his complaint against

Oda. 2-ER-256–280. After the NOPR, Plaintiff amended his EEO Complaint to

include his removal. 2-ER-281–285. The investigation of his EEO Complaint was

completed on January 17, 2017, and Plaintiff requested a hearing before the EEOC

on January 30, 2017. 5-ER-923, 954.

Following the Notice of Decision – Removal, Plaintiff again amended his EEO Complaint to include his removal and later, on March 29, 2017, filed a *pro se* appeal of his removal to the MSPB. 2-ER-286–293. On June 13, 2017, the MSPB Administrative Judge ("***AJ***") properly dismissed the appeal without prejudice, because Plaintiff had a pending EEO complaint concerning his removal. 2-ER-368–380.

On October 3, 2017, Plaintiff filed with the EEOC an unopposed motion for partial dismissal of the issue of termination. 5-ER-882. On November 9, 2017, the EEOC granted the motion "to dismiss that portion of his EEO Complaint alleging wrongful termination." *Id*.

On December 6, 2017, Plaintiff timely re-filed his appeal to the MSPB asserting discrimination and retaliation as affirmative defenses to the termination. 5-ER-864–884. An MSPB hearing was held on February 12, 14, and 16, 2018, before AJ Holly L. Parks. 3-ER-392–631, 4-ER-633–855. On May 24, 2018, Judge Parks issued a decision upholding Plaintiff's removal from employment based on the single charge of conduct unbecoming of a Police Officer, finding that all of the specifications were valid except for the specification of misrepresentation when using sick leave. 1-ER-69–82. The judge also found against Plaintiff on his affirmative defenses of discrimination and retaliation based on sexual orientation. 1-ER-84–89.

On July 27, 2018, Plaintiff filed a complaint with the U.S. District Court of Hawaiʻi appealing the MSPB decision and asserting separate claims of discrimination and retaliation on the bases of his sexual orientation and race in violation of Title VII. D. Ct. Dkt. 1 (Compl). ¶¶ 39, 40, 2-ER-388.

On December 27, 2019, Defendant filed a motion to dismiss, or in the alternative, motion for summary judgment (the "***Motion***"). D. Ct. Dkt. 55. The Motion argued, among other things, that the district court lacked subject matter jurisdiction, because Plaintiff had failed to exhaust administrative remedies as to his Title VII race and gender discrimination and retaliation claims. *Id*. at 15-18. The Motion also argued that Plaintiff's sexual orientation discrimination claims were not covered by Title VII. *Id*. at 18-20. Finally, it argued that Plaintiff had failed to establish a prima facie case of discrimination and had failed to show that the reasons for his removal were pretextual. *Id*. at 20-27.

Briefing and a hearing on the Motion were stayed pending resolution by the U.S. Supreme Court of whether Title VII protected discrimination on the basis of sexual orientation. D. Ct. Dkt. 64. After the U.S. Supreme Court decided in *Bostock* that Title VII's protections extended to discrimination based on sexual orientation, the district court set a hearing on both Defendant's Motion and the appeal from the MSPB on the CSRA claims. D. Ct. Dkt. 68.

13

On September 8, 2020, Plaintiff filed his opening brief on the appeal from the MSPB arguing, among other things, that Defendant had failed to prove by a preponderance of the evidence that Plaintiff committed the specification of having sex while on duty with Garcia, which was the most serious and principal specification supporting the immediate dismissal of Plaintiff. D. Ct. Dkt. 76 at 13-23. In this respect, Plaintiff argued that the specification could not be sustained based on Garcia's testimony alone as she was biased and had recanted and then re-recanted her sworn statement. *Id*. at 16, 28.

On January 21, 2021, Plaintiff filed his memorandum in opposition to the Motion. D. Ct. Dkt. 85. In his opposition, Plaintiff first argued that he had properly preserved his pretermination discrimination and retaliation claims by filing "a complaint with the [EEOC], alleging discrimination on the bases of his sex (and sexual orientation) and race, for events that occurred prior to his termination." *Id*. at 1, 13. Specifically, Plaintiff explained that he had properly exhausted his administrative remedies as he was allowed to "remove his timely filed EEO complaint to the proper United States District Court if his EEO complaint has not been resolved within 180 days of his requesting an EEOC hearing." *Id*. at 13.

In the opposition to the Motion, Plaintiff also explained that Oda's animus against him—which tainted the entire investigation and subsequent actions—was based on his sexual orientation as Oda knew Plaintiff to be bisexual. *Id*. at 14; D.

14

Ct. Dkt. 76 at 45-46. Finally, Plaintiff argued that there was a causal link between the adverse employment actions taken against him, from the initiation of the investigation through his removal, and his complaint against Oda for calling Plaintiff a "fag." D. Ct. Dkt. 85 at 14-16. This created an issue of material fact as to whether such adverse actions were taken, at least in part, either in retaliation for Plaintiff's protected conduct or because of his sexual orientation. *Id*.

On March 2, 2021, the district court granted Defendant's Motion and affirmed the dismissal decision, finding that (1) Plaintiff had "failed to exhaust his administrative remedies as to his retaliation claim, his race discrimination claim, his sex discrimination claim (to the extent it is distinct from his sexual orientation claim), and his hostile work environment claim," 1-ER-23, (2) the evidence proffered by Plaintiff was "not enough to establish that the investigation and ultimately termination of Plaintiff was the result of discrimination by the deciding agency officials," 1-ER-34, (3) Plaintiff had abandoned his retaliatory termination claim before the MSPB, 1-ER-29, and (4) the "ALJ's findings and penalty imposed were reasonable, supported by the substantial evidence, not arbitrary or capricious, and in accord with relevant law." 1-ER-43.

With respect to exhaustion, the district court held that because this was a mixed case, Plaintiff could and should have brought his entire case before the MSPB and his failure to do so was fatal. 1-ER-27–28. Concerning the evidence of

discrimination, although the district court found that "Oda's comments reasonably show some animus on his part based on sexual orientation" and that he "was initially assigned to investigate Plaintiff," 1-ER-33–34, the court explained that "Plaintiff's supervisors (<u>not</u> Officer Oda) determined that Plaintiff should be removed from his position" and held that Plaintiff had failed to show any animus on their part. 1-ER-34–43 (emphasis in original).

As to the retaliatory termination claims, the district court found that "Plaintiff only proceeded with the affirmative defense of sexual orientation discrimination (disparate treatment) before the MSPB," 1-ER-29, even though the MSPB explicitly found that Plaintiff had "failed to prove by preponderant evidence that the agency retaliated against him based on his sexual orientation." 1-ER-87. Finally, in sustaining the MSPB decision, the district court held that Plaintiff had "not pointed the Court to any discrediting undisputed fact," even though Garcia had changed her story "at least twice" about having sexual relations at work with Plaintiff, because the AJ had properly addressed that issue in her decision. 1-ER-47–48.

Plaintiff timely filed this appeal pursuant to Rules 3(a)(1) and 4(a)(1)(B) of the Federal Rules of Appellate Procedure.

## SUMMARY OF THE ARGUMENT

In dismissing the majority of Plaintiff's Title VII claims on jurisdictional grounds, the district court got both the facts and law wrong. Factually, the court did not address or consider that Plaintiff effectively severed his discriminatory termination claim from the rest of his Title VII claims by dismissing the former from the complaint pending before the EEOC. 1-ER-9–10. Thus, Plaintiff preserved his pre-termination Title VII claims, which remained pending before the EEOC. Legally, the district court was also wrong in holding that Plaintiff should have brought his entire case before the MSPB. 1-ER-29. Plaintiff simply could not have done so, because, by statute, the MSPB did not have jurisdiction over pre-termination adverse actions, such as the investigation, Plaintiff's placement on administrative duty, or denial of overtime. 5 U.S.C. § 7512; *Sloan v. West*, 140 F.3d 1255, 1259-60 (9th Cir. 1998) ("The [MSPB]'s appellate jurisdiction is not plenary, but rather is limited to those appeals authorized by law, rule, or regulation. 5 U.S.C. § 7701(a)."). Thus, contrary to the court's holding, Plaintiff was allowed to pursue all of his Title VII claims in district court after the agency failed to timely address such claims. *See* 29 C.F.R. § 1614.407(b); 42 U.S.C. § 2000e–16(c).

The district court's analysis of Plaintiff's sexual orientation discrimination claim is equally flawed as there are at least three issues of material fact that should

have prevented the court from granting summary judgment. First, the slurs used repeatedly by the investigator into Plaintiff's alleged misconduct create an issue of material fact as to whether discriminatory animus illegally influenced the adverse actions taken against Plaintiff. *See Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039–40 (9th Cir. 2005). Second, given that they chose Oda to conduct the investigation into Plaintiff, there is a dispute of material fact as to whether Plaintiff's supervisors were also motivated by Plaintiff's sexual orientation. Third, the timing of investigation and other adverse actions against Plaintiff create an issue of material fact as to whether such actions were taken in retaliation for Plaintiff complaining about discrimination and harassment on the basis of his sexual orientation. *See Howard v. City of Coos Bay*, 871 F.3d 1032, 1046 (9th Cir. 2017) ("We have held that speech which occurred within three to eight months of the adverse employment action is easily within a time range that can support an inference of retaliation." (cleaned up)).

Relatedly, the district court also erred in holding that Plaintiff abandoned his retaliatory termination claim during the MSPB Process when Plaintiff raised such affirmative defense and the AJ explicitly addressed the defense finding that Plaintiff "ha[d] failed to prove by preponderant evidence that the agency *retaliated* against him based on his sexual orientation." 1-ER-87 (emphasis added). Thus, the district court is simply wrong in its conclusion that Plaintiff abandoned such claim.

Finally, concerning Plaintiff's CSRA claim, the district court should not have sustained the MSPB decision, because the finding that Plaintiff had sex while on duty was not supported by substantial evidence. Specifically, the recanted and later re-recanted testimony of a disgruntled ex-girlfriend was insufficient to sustain Plaintiff's removal from his position with the U.S. Army. This is particularly true where there was uncontroverted evidence of bias and the second recantation was obtained through threats of termination against the ex-girlfriend.

## STANDARD OF REVIEW

This Court reviews the district court's dismissal of Plaintiff's claims of discrimination and retaliation on jurisdictional grounds *de novo*. *Hicks v. Small*, 69 F.3d 967, 969 (9th Cir. 1995) ("The existence of subject matter jurisdiction is a question of law reviewed de novo."). This includes the dismissal of claims for failure to exhaust administrative remedies or abandonment of such claims before the MSPB. *Jasch v. Potter*, 302 F.3d 1092, 1094 (9th Cir. 2002).

The standard of review for the district court granting summary judgment is also *de novo*. *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) ("Our review of a summary judgment ruling is *de novo*"). "The standard for summary judgment is familiar: 'Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact.'" *Id*. (citations omitted); Fed. R. Civ. P. 56(a).

When considering evidence on summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). This means "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Zetwick*, 850 F.3d at 441 (cleaned up). It also means that "the court must not make any credibility determinations." *Id*. Thus, "where the district court has made a factual determination, summary judgment cannot be appropriate." *Id*.

Finally, this Court's "role with respect to the nondiscrimination claims is to determine whether the district court was correct in upholding the MSPB's decision." *Washington v. Garrett*, 10 F.3d 1421, 1428 (9th Cir. 1993), *as amended on denial of reh'g* (Jan. 26, 1994). For that purpose, this Court must "review the Board's order to make sure that the Board applied the correct legal standards and the entire administrative record to ascertain whether its findings are supported by substantial evidence." *Id*. (citations omitted). In conducting this review, this Court "must consider evidence in the record that undermines as well as that which supports the Board's decision." *Id*. (citations omitted).

## ARGUMENT

I.    **Plaintiff Exhausted Administrative Remedies for His Pre-Termination Discrimination and Retaliation Claims under Title VII.**

The district court did not address several of Plaintiff's Title VII claims for discrimination, harassment, and retaliation on the basis of gender, sexual

orientation, and race, finding that Plaintiff had abandoned or failed to preserve such claims when he filed his "mixed case appeal" with the MSPB. 1-ER-24–25. To reach this conclusion, the district court erroneously held that Plaintiff had to raise "his entire case," that is, all of his Title VII claims, in that "mixed case appeal." 1-ER-22.

The district court's error stems from misunderstanding the statutory and regulatory scheme created by Congress to allow federal employees protected by CSRA to allege illegal discrimination as an affirmative defense to adverse employment actions appealable to the MSPB. *See* 5 U.S.C. § 7702. Under the relevant statute, Congress allowed federal employees affected by a discriminatory adverse employment action that is appealable to the MSPB to (1) file a "mixed case appeal" with the MSPB and raise such affirmative defenses based on illegal discrimination to the proposed employment action, 5 U.S.C. § 7702(a)(1), or (2) file a "mixed case complaint" with the federal agency alleging illegal discrimination based on an action appealable to the MSPB together with other claims related to discrimination not appealable to the MSPB as well, 5 U.S.C. § 7702(a)(2). *See also* 29 C.F.R. § 1614.302(a) (defining "mixed case appeal" and "mixed case complaint").

In dismissing Plaintiff's claims, the district court seemingly ignored that not all negative employment actions are appealable to MSPB. The Board's appellate

21

jurisdiction is limited to reviewing certain more serious adverse actions, namely terminations of employment, reductions in grade or pay, suspension for more than 14 days, or certain furloughs. 5 C.F.R. § 1201.3(a); *see also* 5 U.S.C. § 7512. Thus, "mixed case appeals" to the MSPB and "mixed case complaints" to the agency are different types of processes raising different types of claims. Unlike mixed case complaints, mixed case appeals cannot resolve whether adverse employment actions not appealable to the MSPB were the result of illegal discrimination or retaliation. *See Sloan*, 140 F.3d at 1259 ("The [MSPB]'s appellate jurisdiction is not plenary, but rather is limited to those appeals authorized by law, rule, or regulation. 5 U.S.C. § 7701(a).").

Here, in order to pursue his mixed case appeal before the MSPB, Plaintiff severed his pre-termination claims for discrimination and retaliation from his wrongful discriminatory termination claim by dismissing the portion of his mixed cased complaint alleging such wrongful discriminatory termination. 5-ER-882. Thus, Plaintiff effectively transformed his case pending before the EEOC from a mixed case complaint into a regular EEO complaint. This complaint was not resolved by the mixed case appeal later filed with the MSPB either. Indeed, the MSPB did not have jurisdiction to decide Plaintiff's pre-termination discrimination and retaliation claims, because the adverse actions involved—namely, the investigation, the placement on administrative duty, the denial of overtime, and

even the issuance of the Notice of Proposed Removal—were not the type of adverse action appealable to the MSPB. *See* 5 C.F.R. § 1201.3(a). Finally, the EEOC's failure to decide Plaintiff's EEO Complaint in a timely fashion allowed Plaintiff to file this case in district court. *See* 29 C.F.R. § 1614.407(b); *also* 42 U.S.C. § 2000e–16(c). Therefore, contrary to the decision below, the district court had jurisdiction to decide the issues raised in Plaintiff's EEO Complaint.

### A. Plaintiff properly severed his pre-termination claims for discrimination and retaliation from his wrongful discriminatory termination claim initially pending before the EEOC.

Plaintiff initially filed his EEO Complaint raising claims of discrimination, harassment, and retaliation based on his race, gender, and sexual orientation. 2-ER-256–280. Plaintiff specifically complained about the investigation, his placement on administrative duty, and denial of overtime. 2-ER-261. At the time, he could not have brought this complaint to the MSPB, because no adverse employment action appealable to the MSPB had taken place yet. *See* 5 C.F.R. § 1201.3(a); 5 U.S.C. § 7512.

After receiving the notice of removal, Plaintiff again amended his EEO Complaint to include his removal, 2-ER-286–293, converting his case into a mixed case complaint. 29 C.F.R. § 1614.302(a)(1). Thus, when on March 29, 2017, he filed a *pro se* appeal of his removal to the MSPB, the Board properly dismissed the

mixed case appeal without prejudice, because Plaintiff had a pending EEO complaint which included his removal as a claim. 2-ER-368–378.

After retaining counsel, Plaintiff moved to dismiss the portion of EEO Complaint alleging wrongful discriminatory termination. 5-ER-882. This unopposed motion was granted by the EEOC, thus converting the EEO Complaint back from a mixed case complaint into a regular EEO complaint. Plaintiff then filed an appeal of his termination with the MSPB raising discrimination and retaliation on the basis of sex, sexual orientation, and race as affirmative defenses, that is, a mixed case appeal. 5-ER-864–869.[6]

The filing of the second MSPB appeal did not resolve or affect the remaining claims pending before the EEOC. Thus, by severing his termination claims from his EEO Complaint, Plaintiff properly preserved his pre-termination claims for discrimination and retaliation pending before the EEOC.

---

[6] The district court's recitation of this case's procedural history omits the dismissal of the termination claims from the EEO Complaint. Instead, the district court states: "After there was no timely decision on his EEO complaint, Plaintiff ultimately refiled his appeal before the MSPB on December 6, 2017. AR 731-50." 1-ER-10–11. This is not entirely correct. Plaintiff did not file the MSPB appeal after there was no timely decision on his EEO Complaint, instead, he filed the appeal after severing his termination claims from his EEO Complaint. 5-ER-882. This is why he attached the EEOC order of dismissal to the EEO Complaint. *Id.*

**B.**     **The MSPB did not have jurisdiction to decide Plaintiff's pre-termination discrimination and retaliation claims.**

After explaining that Plaintiff had the option of filing a "mixed case" with the MSPB or a "mixed case" with the EEOC, the district court held:

> Whichever of these options a federal employee elects to pursue, he is required to raise his entire mixed case in the chosen forum. *See* 29 C.F.R. § 1614.302(b) (providing that the employee must raise his entire mixed case before either the MSPB or the EEOC, 'but not both'). If a plaintiff has filed both an EEO complaint and an MSPB appeal related to the same adverse employment action, "whichever is filed first shall be considered an election to proceed in that forum." *Id*.

1-ER-22. The court further stated that after "Plaintiff elected to refile his MSPB appeal . . . [, f]rom that point on, everything Plaintiff had raised in his EEO complaint were [sic] transferred to the MSPB proceeding." 1-ER-24. The district court's understanding of the law and relevant procedures is incorrect, however.

As explained above, a mixed case complaint is not the same as a mixed case appeal as they do not necessarily involve the same adverse employment actions. *See* 29 C.F.R. § 1614.302(a). These are different procedural vehicles, which the district court appeared to conflate, referring at times to both of them as a "mixed case." *See, e.g.*, 1-ER-22. Whereas a mixed case *complaint* can challenge both a discriminatory termination together with other related and unrelated discriminatory actions, a mixed case *appeal* may only bring up discrimination as an affirmative defense to an adverse employment action appealable to the MSPB. *Compare* 5

U.S.C. § 7512(a)(2) and 29 C.F.R. § 1614.302(a)(1) *with* 5 U.S.C. § 7512(a)(1) and 5 C.F.R. § 1201.151(a)(1); *see also Sloan*, 140 F.3d at 1259 ("[A] 'mixed case appeal' is not a subset of a 'mixed case complaint.' The MSPB must decide it has jurisdiction over a case before it becomes a 'mixed case appeal.'"). Thus, contrary to the district court's reasoning, Plaintiff could not have brought his "entire mixed case" before the MSPB as the Board would not have had jurisdiction over pre-termination adverse employment actions, such as the investigation, the placement of Plaintiff on administrative duty, and the denial of overtime. *See* 5 C.F.R. § 1201.3(a); 5 U.S.C. § 7512; *see also Sloan*, 140 F.3d at 1260 ("The MSPB does not possess jurisdiction over claims that do not fall into one of the five 'adverse action' categories outlined in 5 U.S.C. § 7512."). For these same reasons, it is not true that after refiling his MSPB appeal, "everything Plaintiff had raised in his EEO complaint were [sic] transferred to the MSPB proceeding." 1-ER-24.

The district court ignored the MSPB's jurisdictional limitations arguing instead that the focus should be on whether "Plaintiff's various administrative filings raised related and overlapping issues." 1-ER-25–28. This test, however, is nowhere mentioned in the relevant statute or regulations, which instead focus on the type of adverse action involved. *Sloan*, 140 F.3d at 1260 ("[T]he MSPB may not exercise jurisdiction over a claim of discrimination that is completely divorced from a personnel action otherwise within its jurisdiction pursuant to § 7512."). The

district court's proposed test would result in employees being forced to forego their civil rights claims based on adverse actions not appealable to MSPB, whenever they decide to pursue a "related and overlapping" affirmative defense with the Board. If that was the intent of the statutory scheme and regulations, they would say as much and due process would require, at a minimum, that Plaintiff receive adequate notice that he was foregoing his EEO Complaint by virtue of filing the MSPB appeal. *Cf. Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 261 (1957) (notice deemed insufficient where consequences of failure to respond were not properly explained).

Moreover, the resolution of Plaintiff's affirmative defenses by the MSPB did not resolve the claims raised in his EEO Complaint either. While the MSPB (wrongly) decided that discrimination on the basis of sexual orientation and retaliation were not valid affirmative defenses to the *termination*, the Board did not consider or decide—nor could it have—whether referring to Plaintiff as "fag" or "faggot" multiple times, the investigation, placement on administrative duty, and denial of overtime were discriminatory or retaliatory in nature, thus violating Plaintiff's rights under Title VII. Therefore, it is not that Plaintiff "abandoned" his other claims when he did not raised them as standalone Title VII claims with the MSPB, as the district court suggested Plaintiff should have done, it is that the MSPB does not have jurisdiction to resolve standalone Title VII claims outside the

context of an affirmative defense to an adverse action appealable to the Board. Simply stated, a mixed-case appeal is not a mixed-case complaint.

### C. The failure to decide Plaintiff's pre-termination claims within 180 days from the filing of the EEO Complaint allowed Plaintiff to pursue his Title VII claims in district court.

Because the MSPB could not decide all of the claims raised in the EEO Complaint and the EEOC retained jurisdiction to decide Plaintiff's pre-termination claims that were not appealable to the MSPB, the EEOC's failure to decide the EEO Complaint in a timely manner satisfied the administrative exhaustion requirement for such claims.

The EEOC regulations provide that "[a] complainant who has filed an individual complaint . . . is authorized under title VII . . . to file a civil action in an appropriate United States District Court . . . [a]fter 180 days from the date of filing an individual . . . complaint if agency final action has not been taken." 29 C.F.R. § 1614.407(b); *see also* 42 U.S.C. § 2000e–16(c) ("[A]fter one hundred and eighty days from the filing of the initial charge . . . with the department, agency, or unit . . . , an employee or applicant for employment, if aggrieved . . . by the failure to take final action on his complaint, may file a civil action as provided in section 2000e–5 of this title."). Here, Plaintiff filed his initial EEO Complaint against the U.S. Army on August 15, 2016, and after multiple amendments to the EEO Complaint, requested a hearing before the EEOC on January 30, 2017. 2-ER-256–

280, 5-ER-923. The agency did not take final action within 180 days from either date. It also did not take final action within 180 days from November 9, 2017, when the EEOC dismissed "that portion of [Plaintiff's] EEO Complaint alleging wrongful termination." 5-ER-882. Therefore, Plaintiff was authorized by statute and regulation to file civil action raising the same pre-termination claims filed with, but not decided by, the agency, and the district court had jurisdiction to decide such claims. *Al-Saffy v. Vilsack*, 827 F.3d 85, 93 (D.C. Cir. 2016) (where federal employee filed an EEO complaint against the Agriculture Department and "the Agriculture Department failed to act, [employee had] the *option* to file suit in court any time '[a]fter 180 days from the date of filing' the administrative complaint with that agency. 29 C.F.R. § 1614.407(b)."); 42 U.S.C. § 2000e–5(f)(3) ("Each United States district court . . . shall have jurisdiction of actions brought under this subchapter").

## II.     Issues of Material Fact Prevent Granting Summary Judgment on Plaintiff's Discrimination Claims.

There are at least three issues of material fact that should have prevented the district court from granting summary judgment to Defendant in the instant case. First, the slurs "fag" and "faggot" used repeatedly by Oda—the investigator into Plaintiff's alleged misconduct—are sufficient for a jury to find that Plaintiff's sexual orientation and sex stereotypes were motivating factors for the adverse actions taken against Plaintiff. *See Dominguez-Curry*, 424 F.3d at 1039–40

("Where, as here, the person who exhibited discriminatory animus *influenced or participated* in the decision making process, a reasonable factfinder could conclude that the animus affected the employment decision." (citations omitted and emphasis added)). Second, there is evidence that Plaintiff's supervisors knew that Plaintiff had complained about being called a "fag" by Oda and that Oda had called Plaintiff similar slurs in other occasions, yet a mere few weeks after the incident, they appointed Oda—a person with no formal investigative training—to investigate the allegations against Plaintiff nevertheless. This too creates an issue of material fact as to whether Plaintiff's supervisors were motivated by animus against people who do not conform to heterosexual norms such as Plaintiff. Third, the timing of the investigation and subsequent adverse actions against Plaintiff tend to show that those actions were taken in retaliation for Plaintiff complaining about discrimination and harassment on the basis of his sexual orientation. *Howard*, 871 F.3d at 1046 ("We have held that speech which occurred within three to eight months of the adverse employment action is easily within a time range that can support an inference of retaliation." (cleaned up)).

    **A.**    **Slurs used repeatedly by investigator into Plaintiff's alleged misconduct are sufficient to create an issue of material fact as to whether Plaintiff's sexual orientation was a motivating factor for the investigation and other adverse actions taken against Plaintiff.**

Title VII makes it unlawful to discharge or otherwise discriminate against an employee "with respect to [their] compensation, terms, conditions, or privileges of

employment" because of their sex. 42 U.S.C. § 2000e-2(a). Similar protections have been extended to most federal employees. *See* 42 U.S.C. § 2000e-16(a). In *Bostock*, the U.S. Supreme Court held that discrimination on the basis of sexual orientation or gender identity constitutes discrimination because of sex. 140 S. Ct. 1731, 1754 ("An employer who fires an individual merely for being gay or transgender defies the law."). To show discrimination, a plaintiff may show that the protected characteristic was either the sole reason or a motivating factor for the adverse action. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856-57 (9th Cir.2002) (en banc), *aff'd*, 539 U.S. 90 (2003). If plaintiff shows the protected characteristic was a motivating factor, then defendant may show that it would have taken the same decision even if plaintiff's protected characteristic played no role, in which case the plaintiff's relief is limited to declaratory relief, attorneys' fees and costs. *See* 42 U.S.C. § 2000e-5(g)(2)(B); *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 760 (9th Cir. 1996).

Plaintiff presented evidence to the district court that Oda had called Plaintiff a "fag" and "faggot" on multiple occasions in front of others, both to his face and behind his back. 3-ER-460, 5-ER-790–791. There was also evidence that Oda knew that Plaintiff was bisexual as Plaintiff had told Oda as much in January 2016. 5-ER-825–826, 2-ER-117–122, 127–129. Even Oda's admitted justification for using the slur, namely that Plaintiff was acting like "a coward," appears to be

based on gender and heteronormative stereotypes. 3-ER-460–461. Thus, it is reasonable to infer on summary judgment that Oda harbored animus against Plaintiff because of his sexual orientation. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 n. 9 (9th Cir.2004) ( "[A] trier of fact may certainly conclude that, in light of[the defendant's] use of a racial slur, his other abusive remarks to [an employee] were also motivated by racial hostility."); *Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1180 (9th Cir.1998) ("[D]iscriminatory remarks are relevant evidence that, along with other evidence, can create a strong inference of intentional discrimination.").

Assuming Oda harbored such animus against Plaintiff because of his sexual orientation, it is also reasonable to conclude such animus affected and influenced the investigation into Plaintiff's alleged misconduct, his placement on administrative duty, proposed termination, and eventual termination. Indeed, there is ample evidence that Oda's bias and animus against Plaintiff played a role in how he conducted the investigation. First, Oda did not simply focus on the allegations at hand, which were that Plaintiff had acted in an unprofessional manner towards Sewell on a single occasion. Oda could have interviewed Sewell and a few corroborating witnesses of Plaintiff's actions that day and reported back to his supervisors. Instead, Oda went well beyond the scope of the initial investigation by

interviewing a number of people who were not witnesses to Plaintiff's alleged unprofessional conduct towards Sewell. 2-ER-223–229.

Second, once more serious allegations against Plaintiff emerged, namely, that he was having sexual relations with Garcia at work, Oda did not review camera footage, text messages, schedules, or communications to corroborate Garcia's version of the events or a single instance of alleged misconduct. 4-ER-681–682, 3-ER-429–430, 512. Oda also did not investigate or confront the other police officers who were allegedly covering for Plaintiff when he was having sex with Garcia either. 2-ER-231.

Third, Oda also did not interview exculpatory witnesses, such as Aczon, who would have testified that other witnesses wanted Plaintiff to be fired. 3-ER-482–483; 5-ER-1018.

It was based on Oda's fishing expedition and shoddy investigation that Plaintiff was placed on administrative duty and eventually terminated. Thus, under such circumstances, it is a reasonable inference that Oda's bias against Plaintiff due to his sexual orientation was a motivating factor for the investigation and other adverse actions taken against Plaintiff. *See Dominguez-Curry*, 424 F.3d at 1039–40 (focusing on whether "the person who exhibited discriminatory animus *influenced or participated in* the decision making process" (citations omitted and emphasis added)); *see also Lam v. Univ. of Haw.*, 40 F.3d 1551, 1560 (9th Cir.1994) (noting

that the university hiring process is "not insulated from the illegitimate biases of faculty members" and that among a group of fifteen decisionmakers, "even a single person's biases may be relatively influential").

Here, the district court initially analyzed this claim under the *McDonnell Douglas* burden shifting framework, finding that Plaintiff had not proven his *prima facie* case, because he had failed to identify a similarly situated individual outside his class who was treated more favorably. 1-ER-32–33. Of course, such a similarly situated individual existed: Oda had used language more offensive against Plaintiff than Plaintiff ever used against Sewell. And yet Oda received a slap in the wrist and shortly thereafter, a promotion with no serious investigation into his admitted use of similar slurs in the past, *see infra*, whereas the allegations against Plaintiff resulted into a lengthy investigation with multiple interviews and sworn statements taken, placement on administrative duty, and eventually, Plaintiff's termination.[7]

But that was not the only error by the district court, which was reluctant to impute Oda's discriminatory bias and investigatory decisions onto the agency, because "Officer Oda was not involved in the NOPR and ultimate removal

---

[7] Similarly, it does not appear that there was an investigation into allegations that other TAMC police officers used the same storage room at issue to have sex during work hours. Specifically, Oda asked Garcia "Where you ever up there on the 10th floor with Officer Crowe? What was your business there?" And she responded: "Yes, he introduced me to the location and said this is where other TPD officers go to have sexual relations." 2-ER-231.

decision" and Plaintiff had failed to show that his supervisors had any discriminatory motive. 1-ER-39–40. The court's reasoning is wrong on both counts. First, Officer Oda was involved in the NOPR and ultimate removal decision by virtue of being put in charge of the investigation that led to those decisions. *See Dominguez-Curry*, 424 F.3d at 1039–40. Second and relatedly, there was evidence of animus on the part of Plaintiff's supervisors, namely, they put in charge a person who had recently been admonished for using slurs against Plaintiff in charge of investigating Plaintiff. *See infra*. Under such circumstances, the court simply erred in resolving these matters of fact, credibility, and reasonable inferences in favor of Defendant and not Plaintiff. *See Zetwick*, 850 F.3d at 441.

**B.    There is a dispute of material fact as to whether Plaintiff's supervisors were motivated by animus against people who do not conform to heterosexual norms such as Plaintiff.**

Even if Oda's animus against Plaintiff is insufficient to create an issue of material fact as to Defendant's motivations for investigating and disciplining Plaintiff, the actions of Plaintiff's supervisors also suggest that they were motivated, at least in part, on Plaintiff's sexual orientation.

Ballesteros' decision to put Oda, a man he knew had called Plaintiff a "fag" and "faggot" on multiple occasions, in charge of the investigation into Plaintiff, a mere weeks after Plaintiff complained about Oda's use of the slurs, is strong evidence that the investigation and disciplinary actions against Plaintiff were

motivated, at least in part, by Plaintiff's sexual orientation. This is the equivalent of a supervisor putting the person recently admonished for using a racial slur in charge of investigating the person of color who complained about the use of the slur in the first place. At best, this is indicative of deliberate indifference to prejudices and bias, but at worst, it reasonably suggest a similar animus on the part of the supervisor as well.

And here, there is reason to believe that Ballesteros shared Oda's bias and prejudices against Plaintiff. For once, Ballesteros barely admonished Oda for calling Plaintiff "fag" and "faggot" on several occasions. He also did not demand a thorough investigation into Oda's use of the slurs as he demanded into Plaintiff's unprofessional conduct towards Sewell. In fact, Ballesteros promoted Oda to lieutenant a mere month after the incident took place. 4-ER-712–713. In other words, there is evidence that Ballesteros was not really bothered by the use of such slurs against Plaintiff. Indeed, Ballesteros downplayed the use of the slur "fag" as "playful" and "the way most guys would talk amongst each other," further justifying the use of the offensive slur as appropriate depending on the circumstances. 4-ER-668, 676–677. Such explanations strongly suggest that Ballesteros too harbored prejudices and bias against people who do not conform to gender stereotypes and heterosexual norms, such as Plaintiff. *See Bostock*, 140 S.

Ct. 1731, 1742 (explaining that employer who fires an employee for "failing to

fulfill traditional sex stereotypes" is subject to liability under Title VII).[8]

**C.**   **The timing of the investigation and other adverse actions against Plaintiff create an issue of material fact as to whether such actions were taken in retaliation for Plaintiff complaining about discrimination and harassment on the basis of his sexual orientation.**

Title VII makes it unlawful to discriminate against an employee "because he

has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a).

Equivalent protections against retaliation apply to federal employees. *See* 29

C.F.R. § 1614.101(b) ("No person shall be subject to retaliation for opposing any

practice made unlawful by title VII of the Civil Rights Act."). To show unlawful

retaliation has occurred, an employee must show that (1) they participated in a

protected activity under federal law, such as filing a discrimination complaint,

(2) the employer subjected the employee to an adverse employment action, and

(3) the employee was subjected to such adverse employment action because of his

participation in the protected activity. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885,

894 (9th Cir. 2005).

---

[8] While Ballesteros denied knowing that Plaintiff was bisexual prior to the filing of the EEO Complaint, 2-ER-196, Plaintiff's complaint against Oda for calling Plaintiff a "fag" put Ballesteros on notice that Plaintiff was sufficiently bothered by the term and may not conform to heterosexual norms. 2-ER-170.

Here, the is no question that Plaintiff participated in a protected activity when he first complained about being called a "fag" by Oda and later filed the EEO Complaint. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000) (holding that informal as well as formal complaints or demands are protected activities under Title VII). There is also little question that the lengthy investigation into Plaintiff, his placement on administrative duty, the denial of overtime, and eventual termination are adverse employment actions for purposes of retaliation claims under Title VII, because a reasonable employee would find such actions materially adverse, that is, such actions may dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (defining adverse employment action for purposes of retaliation); *see, e.g., Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir.2013) (en banc) (holding that placement of employee on administrative leave and loss of pay and opportunities constituted adverse employment action); *Ulrich v. City and Cty. of San Francisco*, 308 F.3d 968, 977 (9th Cir.2002) (holding that a hospital's investigation of a doctor that threatened to take away the doctor's clinical privileges was an adverse employment action).

The question is then whether Plaintiff was subjected to such adverse employment actions because of his formal and informal complaints about

discrimination. Regarding this third element, Plaintiff must establish that his protected activity was "a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). The causation element may be inferred based solely on the proximity in time between the protected action and the retaliatory acts. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding causation may be inferred from proximity in time between acts). There is no *per se* too long or too short period of time that satisfies the causation requirement. *Howard*, 871 F.3d at 1046. However, adverse actions taken within three to eight months from protected activity fall "easily within a time range that can support an inference of retaliation." *Id.*

Here, the investigation into Plaintiff took place less than two months after he had complained about Oda calling him a "fag," and about a month later Plaintiff had already been place on administrative duty and stripped of all police powers. 2-ER-171, 264. This was not a discrete investigation such as the one of Oda's use of slurs against Plaintiff, which lasted about two days. Instead, the investigation was all-embracing and went well beyond the incident with Sewell. The Notice of Proposed Removal against Plaintiff was also issued less than three months after Plaintiff formally filed his EEO Complaint. 2-ER-174–177, 256-280. These short time gaps support an inference of retaliation. *Howard*, 871 F.3d at 1046.

But temporal proximity is not the only evidence of retaliation. Ballesteros' own actions tend to show that he felt that Plaintiff had blown things out of proportion by complaining about Oda's use of the slur "fag." Not only did Ballesteros downplay the significance of the slur, 4-ER-668, 676–677, but he promoted Oda to lieutenant a few weeks after being "reprimanded" for such comments and chose Oda, of all people, to conduct the investigation. 4-ER-712–713, 4-ER-656. Under such circumstances, a jury should be allowed to draw the reasonable inference that Plaintiff's complaint against Oda and his EEO Complaint were the but-for cause of the various adverse actions taken against Plaintiff by Defendant.

## III.  The District Court Erred in Holding that Plaintiff Abandoned His Retaliatory Termination Claim During the MSPB Process.

The district court refused to consider Plaintiff's Title VII retaliation claim, because it found that Plaintiff had "abandoned" such claim as an affirmative defense before the MSPB. Specifically, while Plaintiff initially asserted retaliation as an affirmative defense to his termination, 5-ER-869, the court held that "[i]t [was] undisputed that Plaintiff only proceeded with the affirmative defense of sexual orientation discrimination (disparate treatment) before the MSPB." 1-ER-29.

The district court based this abandonment theory on Plaintiff not disputing one of Defendant's concise statements of fact, which reads in its entirety: "During

telephonic conferences on April 27, 2017 and June 5, 2017 [before the MSPB],

Plaintiff confirmed that he only intended to raise sexual orientation as an

affirmative defense." 2-ER-150, 110. Plaintiff did not dispute this statement,

because he understood that raising sexual orientation as an affirmative defense

encompassed both his discrimination and retaliation claims related to his sexual

orientation. As explained below, the AJ understood this as well.

The AJ's Initial Decision belies the district court's conclusion that Plaintiff

"abandoned" his retaliation affirmative defense, and therefore, failed to exhaust his

administrative remedies as to that claim. The AJ's holding makes clear that the

decision addressed retaliation as an affirmative defense finding (wrongly) that

Plaintiff "ha[d] failed to prove by preponderant evidence that the agency *retaliated*

against him based on his sexual orientation." 1-ER-87 (emphasis added). To reach

this conclusion, the AJ began by stating that a federal employee is protected

against *both* discrimination based on sex *and* retaliation for the exercise of his Title

VII rights. 1-ER-84 (citing 42 U.S.C. § 2000e-16). The decision goes on to explain

that these claims can be proven through either direct or circumstantial evidence

"that intentional discrimination *or retaliation* was a motivating factor in an

employment action." 1-ER-84–85 (emphasis added). The AJ then considered both

evidence of discrimination, such as Oda calling Plaintiff "a 'fag' or 'faggot' on

several occasions," 1-ER-87, and retaliation such as the deciding officials being

41

"aware of the appellant's EEO complaint, which was based on sexual orientation, several months prior to the issuance of his removal decision." *Id*. With this analysis, the AJ ultimately concluded that Plaintiff "failed to prove by preponderant evidence that the agency retaliated against him based on his sexual orientation." 1-ER-87.

Of course, the AJ's conclusion was neither binding on the court in summary judgment nor an appropriate decision for such posture, particularly in light of the multiple determinations of credibility and resolution of issues of material fact by the AJ. For example, the AJ found Oda credible when he testified that he believed Plaintiff to be heterosexual and that he did not use the term "fag" or "faggot" as slurs based on Plaintiff's sexual orientation. 1-ER-87–88. A jury could reasonably reach a different conclusion based on Oda's repeated use of that specific slur against Plaintiff and others. Similarly, the AJ believed that Plaintiff's supervisors "were unaware of the appellant's sexual orientation," as "they both unequivocally denied that his sexual orientation played any role in their actions." 1-ER-88–89. Yet as explained above, they should have been on notice about Plaintiff's sexual orientation based on his complaint against Oda and the EEO complaint, even if Plaintiff did not explicitly come out as bisexual. Indeed, it is also reasonable to believe that Oda told his supervisors about Plaintiff's sexual orientation and that they were upset about Plaintiff making a fuss about it. In any event, these are

questions for the jury, not the court to the decide as Plaintiff has introduced

sufficient direct and circumstantial evidence of animus to survive summary

judgment for both his retaliation and discrimination claims. *See supra*.

**IV.  The Recanted and Re-Recanted Testimony of a Disgruntled Ex-Girlfriend Was Insufficient to Sustain MSPB's Decision Upholding Plaintiff's Removal from his Position with the Army.**

This Court must review the MSPB's order sustaining Plaintiff's dismissal

"to make sure that the Board applied the correct legal standards and the entire

administrative record to ascertain whether its findings are supported by substantial

evidence." *Garrett*, 10 F.3d at 1428 (citations omitted).

While Plaintiff was dismissed based on a single charge of "conduct

unbecoming of a Police Officer," of the five specifications in the NOPR, the only

serious allegation meriting Plaintiff's discharge without engaging in progressive

disciplinary action was having sex with Garcia while on duty.[9] In turn, this

specification was based on the sworn statement by Garcia to Oda on April 29,

2016, which alleged that she had sex with Plaintiff at work three to four times a

week for six months. 2-ER-231. Garcia's testimony is the primary evidence against

---

[9] The rest of the specifications concerned engaging in extended periods of social interaction and gossip, inappropriate unprofessional behavior towards other employees while on duty, and misrepresentation when using sick leave. The last specification was not sustained by the MSPB and the rest are significantly less serious and do not merit immediate dismissal from federal employment.

Plaintiff, because Oda did not further investigate these allegations, including by looking into camera footage, email evidence, hospital logs, etc., let alone corroborated a *single instance* where Plaintiff and Garcia had sex while on duty.

In a statement dated November 28, 2016, Garcia recanted her sworn statement explaining that due to pressure and stressors in her life—presumably related to her recent breakup with Plaintiff—she felt "obligated to make false statements." 2-ER-173. After recanting her statement, Garcia received a notice of proposed removal dated May 2, 2017, "for making a false sworn statement" based on her recantation of her testimony against Crowe. 7-ER-1413–1414. The notice explained: "The Army Table of Penalties suggests a penalty of a written reprimand to a removal for making false sworn statements. Although this is your first disciplinary action, I believe the proposed penalty is appropriate because your sworn statement was a significant factor in the removal of a Federal Employee." 7-ER-1414.

About two weeks later, Garcia sent an unsigned email recanting her "recanted statement and follow[ing] through [her] original statement made to Kevin Oda on 29April2016" explaining she felt pressure from Officer Justin Brower, who pointed out the unfairness of only Plaintiff, but not Garcia, being disciplined for having sex at work, and that she had been struggling with on-going

44

depression. 7-ER-1415. Garcia was not dismissed following this second recantation. 3-ER-539.

Garcia's recantation and re-recantation were not the only evidence that her testimony was inherently not credible. There was also a written statement by Plaintiff's landlord, who was also his roommate, dated November 5, 2016, in which he described in detail how on December 31, 2015, after Plaintiff broke up with Garcia, she made sexual advances towards the roommate and asked him to kick Plaintiff out of the house, so that Plaintiff would have no option but to move in with her. 6-ER-1219–1222. When the roommate suggested she leave Plaintiff alone, Garcia got upset and threatened to make Plaintiff's life at work "a living hell." 6-ER-1222.

The district court affirmed the MSPB decision on the basis that AJ had found Garcia's re-recanted testimony ultimately credible. 1-ER-47–49. In justifying its deference to the AJ's credibility determination, the court explained that "Plaintiff ha[d] not pointed the Court to any discrediting undisputed fact , nor has he shown that the credited testimony was inherently improbable." 1-ER-47 (citing *Figueroa v. Nielsen*, 423 F. Supp. 3d 21, 31 (S.D.N.Y. 2019)). Of course, the fact that Garcia recanted her testimony against Plaintiff is itself "a discrediting undisputed fact." Just as the use of the slur "fag" is some of the best evidence of animus against Plaintiff, Garcia's recantation of her statement is some of the best

evidence against her credibility. Indeed, the re-recantation, coupled with threats about making Plaintiff's life at work "a living hell," also make Garcia's testimony, which was not corroborated by camera footage, texts, emails, etc., inherently non-credible.

And yet the district court felt it had to defer to the AJ's credibility determination, because the AJ addressed the recantation in detail by reviewing the record for corroborating and discrediting evidence. However, neither the AJ nor the district court adequately addressed the also undisputed fact that Garcia recanted the recantation under the threat of getting fired herself. Under such circumstances and in light of other credible evidence of Garcia's bias, there was not substantial evidence to sustain the specification against Plaintiff. And without such specification, the rest of the allegations against Plaintiff simply did not merit dismissal. *See supra* n. 9. Therefore, this is one of those rare cases where this Court should reverse both the MSPB and the district court's decision because there was insufficient evidence to sustain either.

## CONCLUSION

Plaintiffs respectfully request that this Court reverse the MSPB's Initial Decision and the district court's order granting Defendant's motion to dismiss, or in the alternative, for summary judgment, and remand with instructions to proceed to trial on all counts in the complaint.

Dated: December 7, 2021                     <u>  */s/* Mateo Caballero          </u>
                                            MATEO CABALLERO
                                            Hawaii Bar No. 10081
                                            mateo@caballero.law
                                            P.O. Box 235052
                                            Honolulu, Hawaii 96823
                                            Telephone:  (808) 600-4749

                                            CABALLERO LAW LLLC

                                            ELBRIDGE W. SMITH
                                            Hawaii Bar No. 2079
                                            shlaw@hawaii.rr.com
                                            ELBRIDGE ZENICHI SMITH
                                            Hawaii Bar No. 10120
                                            shlaw@hawaii.rr.com
                                            745 Fort St Ste 311
                                            Honolulu, HI 96813-3803
                                            Telephone:  (808) 523-5050
                                            Facsimile:   (808) 538-1382

                                            SMITH HIMMELMANN AAL ALC

                                            *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and Circuit R. 32-3(2) because this brief contains 10,783 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman type.

Dated: December 7, 2021       Respectfully submitted,

/s/ Mateo Caballero
_____

Mateo Caballero
CABALLERO LAW LLLC

Elbridge W. Smith
Elbridge Zenichi Smith
SMITH HIMMELMANN AAL ALC

*Attorneys for Plaintiff-Appellant*

## STATEMENT OF RELATED CASES

Counsel for Plaintiffs-Appellants are not aware of any related cases

currently pending before this Court within the definition of Circuit Rule 28-2.6.

Dated: December 7, 2021          Respectfully submitted,

/s/ Mateo Caballero
Mateo Caballero
CABALLERO LAW LLLC

Elbridge W. Smith
Elbridge Zenichi Smith
SMITH HIMMELMANN AAL ALC

*Attorneys for Plaintiff-Appellant*